First up, we have NRA Fab 5 LLC, two consolidated cases, Carolyn Jean Lindholm appearing for appellant, Carolyn Dye-Appley, trustee appearing pro se, and Corey Culver appearing for Appley's Cowley Performance Horses and Tuscaloosa Creek Ranch. Thank you. Ms. Lindholm, would you like to reserve some time for rebuttal? Yes, yes, please. Five minutes. Five minutes. Okay. Go ahead, please. Thank you. This is a case in which the unsecured creditors, the stable and the trainer, caused the need for the bankruptcy. We had breeding for these stallions arranged, and they prevented the stallions from getting their final certification, from being able to go out to the vet facility and breed. Once that was not working, when we filed a Chapter 11, we wanted to try to save them. Ms. Lindholm, this is Judge Spraker. When you say we, who filed the Chapter 11? FAB 5 LLC. All right. And that's because at that time, you believed and your husband believed that FAB 5 owned the horses, correct? That is correct. But you believe now that your husband owns the horses? That is correct. We discovered that after the accountant died. The problem is, I believe the record is fairly clear, I'd like you to confirm, you represent FAB 5? Correct. Why do you have standing? I'm sorry. Why do I have what? Have standing. FAB 5 is a Chapter 7 debtor, has been dispossessed and replaced by the trustee. And you are saying that your husband has the horses. Why isn't he the appellant? He's the one with the interest. Well, he would like to be here to argue today, and I know he was going to request it. No, no, he's not the appellant, though. The appellant is FAB 5. And I don't know how you are bringing a claim on behalf of the Chapter 7 debtor, who is now dispossessed by the trustee, on behalf of your husband. I think part of the problem, Your Honor, is that this has been rushed through the beginning. When we filed this, before all the papers were even due, the U.S. trustee filed for a dismissal or conversion to Chapter 7. We got no stay at all. We tried to arrange with the Chapter 7 trustee, the owner of the horses, by then we had discovered who owned them, to pay for their expenses and to give us time to move along. And we later found the same day she was filing a request for an order shortening time on a motion to sell the horses. This has been rushed along. We've requested a—everything we know is that there was a fake auction of these horses. We've requested an evidentiary hearing, and the first time we got a ruling on this was in the middle of another hearing, and the judge gave us no time to bring in witnesses or produce—to do the hearing. Excuse me, though, but this is Judge Corbett. That is the problem, is that it's been rushed so much that I think you raise a good point. But the way this has been rushed along, it hasn't been possible to really handle this. Well, but—this is Judge Corbett. When you filed your notice of appeal, the facts that Judge Spraker just asked you about and which you acknowledged, you knew all of those things. So things might have been rushed, in your opinion, as for the sale of the horses and figuring out what was going to do there, but how were you rushed when you filed your notice of appeal? We've been rushed all along, and on the sale of the horses, and we were still finding out facts on the ownership, I believe. Can I ask—this is Judge Spraker again—what exactly are you appealing, if you could walk me through that? Yeah. We're appealing that we weren't allowed to continue as a Chapter 11 and try and save the business, and that the horses were sold. The court did not have jurisdiction to order the sale of horses that do not belong to FAB 5. That was known by the time the court ordered their sale. When I went back and reread your briefs, both the opening and the reply, they seem to focus on due process. Yes. Are you—is that what you're arguing? What I'm arguing is that what decision should be overturned as error due to lack of due process? There's two orders, right? The sale and the good faith determination. So can you walk me through that as applied to due process, and do you appeal anything else other than due process as to one or both of those orders? We assert due process as to both of those orders, and this fake auction should be set aside, and we should be allowed—whoever owns the horses now should be able to do a Chapter 11 or whatever is appropriate. Well, see, that gets back to the standing. If these horses are really your husband's, there's nothing in the bankruptcy to do. And your secure creditors should then be able to do whatever they have—the secure creditors that have a security interest against the horses have no stay because, in your view, your husband owns those horses, and there is no bankruptcy for your husband. So again, that seems to be not right, that there has been a stay now for seven horses that you say are not the debtors. Well, Your Honor, what we are appealing is due process and that the sale of the horses should not have been allowed because they are not assets of the bankruptcy. And a good faith settlement order should not be allowed because it was, as far as we can find out, not a commercially reasonable or legitimate auction, and we were not allowed to have an evidentiary hearing on that. I'm going to jump in for just a second. I just realized a minute or two ago that the courtroom clock isn't working, so I'm going to kind of roughly work from my watch, and I'm just going to say that you have about three minutes left before your ten minutes is up, and then you'll have five more minutes after that. So please go on. I'm sorry about the clock not working, but please go ahead. No, no, that's fine. At this point, I would ask, do Your Honors have any further questions? Not at this time. I don't? No. Okay. So you've now, I'll give you eight minutes for your rebuttal, just since we're kind of roughing things out without a clock. So Ms. Dye, Ms. Culver, how do you want to divide up the 15 minutes for the appellees? Good morning, Your Honor. We've agreed that I'll take the first ten minutes or 12 minutes or so of the time, and then Ms. Culver will sum up for the last three. Okay. Judge Brekker has got a timer on his iPad here, so we'll use that instead. So please go ahead, Ms. Dye. Judges, I actually have an accurate clock here, so I can let you, it's visible just not to you. Oh, that's handy. So I will waive you. All right, we'll have the clerk do it. All right, so one, two, three, go. Thank you. Good morning. You know, this case falls into the trustee category of no good deed goes unpunished, basically. When I was assigned this case, I did what trustees do. I looked at the evidence related to what the property was in the estate. I reviewed the situation with creditors who had claims. I took the actions that are all documented in the docket to procure an order to sell the five horses that could be sold. Two were abandoned back to the Lindholms at the end of that process as not being sold. And what was achieved here by the good question that the court has asked is what was the purpose of filing this case? And I think Ms. Lindholm has summed it up very aptly. She and her husband, who reportedly involved with this LLC, filed this case because of the impending orders in the state court that were going to require them to either post a very significant bond or have those horses auctioned pursuant to state law to cover what were then the material liens that had accrued for care and boarding of the horses. So when we got to this point of the case being converted because there was no compliance at the early stage with the sub five chapter requirements, there was a dialogue between me and the secured creditors. I obtained a stipulation for a carve out and sale of the horses pursuant to that. I filed the proper motions as the record reflects and the court held a very detailed hearing and made extensive findings of fact. Unless those findings are clearly wrong, those are binding in the law of the case. Unless this judge made an error of law, her firm conviction that you find that she made an error of law, all of those findings are final findings. Let me ask you this. There were two decisions. One was the decision to approve the sale and the second was the good faith decision. Was there a request for an evidentiary hearing with respect to the first decision, the approval of the sale? No. And an opposition was filed by the Lindholms to the extent that there was an opposition. It was considered by the court. The court made detailed findings that the Lindholms were stopped from denying that the horses were property of the estate based on various pleadings and inconsistencies filed. What were the inconsistencies that the court relied upon for the estoppel? Well, you know, in one case, the horses belong to Carolyn Lindholm and in another case they belong to the LLC. In another case they belong to Robert Lindholm. They never really, it was all what was convenient in my opinion as to what they were saying about who owned the horses. There was no evidence presented. That's the key here. There was never any documentary evidence that was submitted to the court. Let me stick on the estoppel point. There has to be both inconsistent statements and the party has to have benefited from one set of those statements. So how did FAB 5 or anybody on that side of the table benefit from the initial representation that FAB 5 owned the horses? Are you speaking about the facts as presented in the state court or in this case? I'm unclear. I'll leave that to you to choose. I mean, there's a judicial estoppel, so the judicial estoppel has to say you take two different positions, you benefited from taking one of them, you're stuck with that one position. So what was the benefit that FAB 5 got from taking the position that it owned the horses? In this bankruptcy case, the benefit was very clear. What they were doing was avoiding the imminent order, entry of an order, to require an auction of the horses by the state court or the posting of a very significant bond, $128,000 of a bond, to avoid that and continue the litigation in that case as to what rights the Lindholms or LLC had in the horses given the fact that the boarding fees and the training fees had not been paid. So the benefit was the automatic stay, basically. Exactly. While we've interrupted you, I think I understand from the record, but I want to make sure. My understanding is that no documentary evidence, any registration, certificate of ownership, and the record's really unclear how you establish ownership of a horse, but no document was ever presented to you? No document was, what I requested very early on in the case, evidence that who the horses belonged to. What was presented in the case to me were the boarding agreements signed by Carolyn Lindholm as an agent for the LLC where that, in those documents, she represented that she, that the LLC owned the horses. That was the party that was entering into the boarding agreements. So at the point in time when I get involved in this mess, if you will, what I had was a secured creditor who had documents saying that the LLC, which was the debtor, owed significant amounts for boarding and training of the horses. The Lindholms or the LLC never presented any other documents beside the unsupported declarations of Robert Lindholm presented at various points in the case as I've referenced in my brief. So the order that's being appealed from was well, which is the only order being appealed from, which is the sale order, was well supported by the record in front of the bankruptcy court. And unless this court finds that she made an error of, that there were no facts to support it and that she made an error of law, that order is a, is a good order. And the reason that we went to a good faith finding hearing later was because at the time we did not know who was going to buy the horses and we did not know at the auction and we did not know what the prices bid would be. And so at that point, the judge said, I can't make a good faith finding yet. You can come back later and do that. So we . . .  Ms. Dye, this is Judge Corbett. Uh-huh. At the time the bankruptcy was filed, as you mentioned, the purpose was to get a stay. At that point in time, had Mr. Lindholm ever asserted that he owned the horses? When did that, when did he first assert that he was the owner? Well, into the case after it was clear that there was going to be a disposition of the  In the petition, the secured creditors are listed. The only secured creditors and the only creditors listed were the trainer and the ranch. And the only property listed was the horses as property of the bankruptcy estate in the petition, a very skinny petition that they filed.  And that petition was signed by . . . Robert Lindholm. While we're interrupting you, Ms. Dye, this is Judge Spraker. Can you address the matter that I raised? It seems to me, picking up the record cold, that FAB 5 is the party that opposed the sale. It is now the party that appeals. In my understanding, I don't know what I'm missing. You have not authorized FAB 5. You have not instituted a appeal for FAB 5. Why does Ms. Lindholm have the ability to represent FAB 5 on appeal in this matter? Your Honor, I don't believe she does, but I didn't really cross that bridge in my briefing because this . . . frankly, the procedural posture taken by Ms. Lindholm and as a result her then client, ostensibly the LLC, has been so confused and so disjointed in terms of compliance with anything related to bankruptcy code provisions that I didn't really address that. I wanted to go to the substance more of who . . . what's this about anyway and whose horses are they? So are you treating this essentially as Mr. Lindholm is really the appellant? I'm not going to go that far. I am saying that there's no basis for the appeal, whether it's because of lack of standing because it's filed by the wrong party or because of the substance of the matter, which is to say that the property was indeed found to be property of the bankruptcy estate. It was sold pursuant to an order that was a standard issue bankruptcy sale order. And the prices . . . yes, sir. Well, you mentioned also, just moving on quickly because I don't want to monopolize your time, but you also mentioned the only order on appeal was a sale order. Is it your position that the second appeal did not capture the good faith issue? I don't think I saw that in your briefing. I would say that, yes, today. The only order that was cited on the record as being subject of this appeal was the order authorizing the sale. Okay. You're about 11 minutes in. I'll just point that out to you so you can reserve enough time for Ms. Culver. I would just offer, in closing in my time, that the bankruptcy court here allowed a lot of leeway, if you will, to this debtor and the debtor's representatives because it was pretty clear that they didn't have much training or familiarity with the bankruptcy court. Or the requirements once you're in bankruptcy. So, the bottom line also is that there were secured creditors who filed a stipulation allowing the property of the debtor to be sold so that their claims could at least be partially paid and they could be relieved of the obligation to provide care for these horses that were still in the stalls. So, they eat every day. Horses eat twice a day. They have to get out of their stalls. They need lots of care and loving and they weren't getting it. And the longer they stayed in the stall, the less value they had. So, the reason for an auction, frankly, was to eliminate additional cost and to provide a way for the horses to have a better life than standing in the stall for months at a time. So, I'll defer to Ms. Culver and let her sum up. Okay. Go ahead, Ms. Culver. Good morning, your honors. I will come to be brief. I do not have much to add to this discussion other than rely on our papers. This has been a long-standing litigation nightmare with the Lindholms since the state court and even before that. It's spanning almost 10 years now in litigation regarding these horses and their non-payment for services related to the horses. This is simply a newest rendition of that. My clients have attempted to work with Ms. Dye and Ms. Lindholm as much as we can to get the money owed to my clients, the creditors, and do the best thing for the horses. This appeal has no basis and it has no evidence supporting it. There, they have relied, Ms. Lindholm and Fab 5, have relied heavily on declarations of Robert Lindholm, which have been self-serving at each turn. Fab 5 has owned the horses in certain litigation cases, as Ms. Dye has mentioned. Carolyn Lindholm has been asserted as the owner of the horses in other situations. And then, of course, Robert Lindholm has been named as the owner of the horses in tertiary litigation and statements. Fab 5 and Carolyn Lindholm have both sued on behalf of issues related to the horses in the past. Robert Lindholm, I believe, and I do not know this for a fact, but he has not, at least in my research and my understanding of the history of these horses in these cases. If you have any questions for me, I'm happy to try and answer them, but I hope that sums up Ms. Dye's argument as well. You have about a minute left, and I just wanted to know if you wanted to add anything on the good faith. We really haven't heard from your side of the aisle on any of the good faith issues, and including, if you care, what we've been told is the pending request for a 2004 exam. I'd like to address that, please, if I may. The good faith findings were based upon evidence presented to the court by way of declaration that these were disinterested buyers, that there was active bidding on the horses. The horses where there was not a bid sufficient to make it worthwhile for the ranch to allow to close at that price were credit bid, and those amounts will be deducted from their claim. The proceeds received were disappointing in the way because they won't satisfy the claims in full, but it did end the process of this long-standing controversy, hopefully, and the horses have been in the possession of these buyers now for months, and so that's sort of like a lot of water under the bridge as it relates to, you know, retaking possessions and going back to square one. That really wouldn't be feasible, honestly. Okay, all right. Thank you. You're at the 15-minute mark. We're a little past it, actually, so we'll go back to Ms. Lindholm, and let me ask, can Ms. Lindholm see a clock? No, I can't, but what I have will only take a few minutes, Your Honor. Okay. Well, I'll give you a maximum of eight, and you certainly don't need to take all that time if you don't wish to, so please go ahead. Thank you, Your Honor. Again, Ms. Dye and Ms. Culver have repeatedly misrepresented the history of these horses to this court, and Ms. Culver is misrepresented to the state court, claiming that there was... Ms. Lindholm, this is Judge Baker again. How do we know based upon the record before us? I have disputed these claims about prior stables that were not paid. I have disputed that. That's the dispute. What is the contra evidence? What is the evidence that you have submitted that establishes not only that there's a dispute, but that the factual findings based upon the evidence that the trustee presented is clearly erroneous? Because they have no basis for what they've stated, and I've submitted declarations explaining that this is not the case, and these prior cases they cite that were for not payment, they're not true. But there's two... You do state that, and the trustee submitted declarations she stated, and then you got to what the bankruptcy court was willing to have an evidentiary, and she made a decision based upon two sets of facts that were given. Well, was there two sets of facts? Because we have one set of facts. We have the stable agreements. I'm not sure exactly if that's what you call them, but the agreements with the stables. I understand that you signed those, Ms. Lindholm, and in those documents you represented that the LLC owned the horses. So there is some evidence that the LLC, the debtor here, owned the horses. There's evidence that the LLC filed the bankruptcy for the purposes of getting a stay. We have that evidence. The trial court had that evidence. What evidence is there to contradict that? They don't have evidence of what they're claiming. Well, they're claiming that the LLC owned the horses, and I just summarized for you evidence that supports the trial court's finding that the LLC did in fact own the horses. What do we have other than unsupported allegations that some other entity owns the horses? I think it's been very clear. The court was looking at declarations from me, from the state court action, as well as in this original, in the bankruptcy. It's very simple. Robert Lindholm bought the horses in Europe. At a later time, after they started to get approved for breeding, they were supposed to be transferred to the LLC. And declarations he did and I did thereafter was that the FAB 5 owned the horses. So those are very consistent. The declarations on that and the evidence on that has been very consistent. Then when the accountant died and it was discovered that Robert Lindholm still owned the horses, that's when we corrected. Where is the evidence supporting that? Where is the specifics? The who, what, when, how? Where is that in the record other than you saying it? Well, that's an interesting point, Your Honor, because the bankruptcy court in ordering the horses looked to the fact that we had previously stated in declarations that FAB 5 owned the  We explained why they didn't. And the judge decided that, well, we've said different things at different times, even though we had a valid explanation as to why. So it's the question to the court, what basis did the court have when we've explained why there was this problem? Charitably speaking, the court didn't believe you. Yeah. And at best, Ms. Lindholm, isn't it that there was a bona fide dispute? That's the best that you have is that there was a dispute as to who owned the horses. But Ms. Dye has summarized evidence that showed that the horses were owned by the LLC. The best you're saying is that there was a dispute. And if there's a dispute, 363 allows for a sale. Is that right? But the court has sold horses that do not belong to the estate. I'm sorry. I think I asked Ms. Dye when I asked you. I thought that I read in the record that there were statements made both to the court and Ms. Dye that you would provide evidence of registration or ownership in documentary form to the trustee in the court. And when we were before Judge Klein, I believe it was the motion for sale, Robert Lindholm was on the phone and he agreed to produce these documents. And then the court continued the hearing to another date and said she would allow no further arguments and there was no further request for any of those documents. And at that point, we had very clearly explained the problems. And there was no there was no indication that the explanations in our declarations as to what had occurred were not were being questioned. Well, that gets to the problem of if there were documents that establish it, why weren't they submitted prior or even after? I think it's got to be declarations, because what we have is we discovered that the accountant did not transfer the horses to Fab 5. So there's not documentation showing they were transferred to Fab 5. There's no there's been no question that Robert Lindholm bought the horses. What the court doesn't have is any at this point any any documentation that Fab 5 owns them. OK, and after you discovered that, did Robert Lindholm ever pay to feed the horses? He offered to. We did. We offered to do this with Carolyn Dye. He offered to have them move to another place. He would pay all their expenses, training, feed everything. And and she said, fine, please submit a stipulation. I prepared the stipulation and then I found out that very day she was making a motion to order shortening time to sell the horses. He he has offered. OK, so this whole mad rush to sell the horses is fake because he offered to sell to take care of the horses, pay all their expenses, get them back in training, which would help their value so we could get them reinspected and get their stallion approvals back. He offered to take care of that, which would have kept their value up. We had breeding contracts that we were not able to fill. We being who? Well, at the time, it was Fab 5. Yeah, yeah. And if I may address one other point just quickly, when Ms. Dye talks about the bankruptcy was filed to avoid a sale of the horses during during a motion for possession of the horses previously in the state court, I had raised the code section about allowing us to post a bond to take to get possession of the horses and the judge wouldn't hear it at that time. The first time she said she had a minute order was after the bankruptcy was filed when she no longer had jurisdiction over the horses. And at that time, she said a bond could be posted. And Robert Lindholm contacted a bonding company and was ready to post a bond. But at that point, the Superior Court judge had no jurisdiction over the horses because there was a bankruptcy. They were in bankruptcy as far as we knew at that time. OK, I think your eight minutes are exhausted. So thank you very much, all sides, for your arguments. The matter is submitted and you'll be getting our written decision promptly. Thank you. Thank you very much. Thank you, Your Honor. Madam Clerk.
judges: Faris, Spraker, and Corbit